# NO. 22-13539

In The

# United States Court Of Appeals
# For The Eleventh Circuit

**PHILIPPE CALDERON, ANCIZAR MARIN,**
**on behalf of themselves and all others similarly situated,**

*Plaintiffs – Appellants,*

**KELLI BOREL RIEDMILLER,**

*Interested Party – Appellant,*

**v.**

**SIXT RENT A CAR, LLC,**

*Defendant – Appellee.*

ON APPEAL FROM THE SOUTHERN DISTRICT OF FLORIDA DISTRICT COURT CASE NO.: 19-cv-62408-AHS

_____

## BRIEF OF APPELLANTS

_____

Janet R. Varnell, FBN:  0071072
Brian W. Warwick, FBN:  0605573
Matthew T. Peterson, FBN:  1020720
Erika R. Willis, FBN:  100021
VARNELL & WARWICK, P.A.
1101 E. Cumberland Ave.
Ste. 201H, #105
Tampa, FL  33602
Telephone: (352) 753-8600
Facsimile:  (352) 504-3301
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
mpeterson@vandwlaw.com
ewillis@vandwlaw.com

*Counsel for Appellants*

## APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In compliance with Local Rule 26.1-1, the undersigned certifies:

The following is a complete list of the trial judges, all attorneys, person, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporations that owns 10% or more of the party's stock and other identifiable legal entities related to a party:

Bentley, Rachel A.

Borel Reidmiller, Kelli

Calamusa, Steven G.

Calderon, Philippe

Emery, Patrick M.

FisherBroyles, LLP

Gordon & Doner, P.A.

Lavender Hoffman Alderman, LLC

Marin, Ancizar

Oria, Irene

Peterson, Matthew T.

Singhal, Anuraag, U.S. District Judge for the Southern District of Florida

Sixt RentA Car, LLC

Sixt SE (Xetra stock exchange ticker "SIX2")

Sixt Transatlantik GmbH

Stahl, Geoffrey S.

Varnell & Warwick, P.A.

Varnell, Janet R.

Warwick, Brian W.

Willis, Erika R.

Pursuant to 11th Cir. R. 26.1-3(b), Defendant-Appellee Sixt's sole member is Sixt Transatlantik GmbH, which is wholly owned by Sixt' s ultimate parent company, Sixt SE, a German corporation the stock of which is publicly traded on German Stock exchanges, including Xetra stock exchange (ticker "SIX2").

Dated: January 30, 2023                      /s/ Brian W. Warwick
                                             Brian W. Warwick

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellants respectfully submit that oral argument is necessary to the just resolution of this appeal and will enhance the Court's decision-making process.

## <u>TABLE OF CONTENTS</u>

**Page:**

APPELLANTS' CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ................................................. i

STATEMENT REGARDING ORAL ARGUMENT ............................................... iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................... vi

STATEMENT OF JURISDICTION ......................................................................... 1

STATEMENT OF THE ISSUES ............................................................................. 2

INTRODUCTION ................................................................................................... 3

STATEMENT OF CASE AND FACTS ................................................................... 5

     A.    Introduction of the Class Action Claims ................................................ 5

     B.    Facts Common to All Sixt Customers, including Plaintiffs ................. 5

     C.    The Plaintiffs' Online Bookings, Rental Car Pick Up, and Damages Paid Pursuant to the Incorporated Terms and Conditions ...................................................................................... 11

          1.    Plaintiff, Philippe Calderon ...................................................... 11

          2.    Plaintiff, Ancizar Marin ........................................................... 13

          3.    Plaintiff, Kelli Borel ................................................................. 14

     D.    The Trial Court's Order ....................................................................... 16

          STANDARD OF REVIEW ........................................................... 18

SUMMARY OF THE ARGUMENT ....................................................................... 19

ARGUMENT ......................................................................................................... 21

I.    Whether the District Court Erred in Finding that Sixt's Terms and Conditions Could Not Be Enforced Against Sixt.........................21

    A.    Borel Received a Copy of the Rental Jacket.............................22

    B.    The District Court Failed to Consider the Intent of the Parties.........................................................................................22

    C.    Access to the Incorporated Document Is All that Is Required ....................................................................................29

II.    Whether the District Court Erred in Finding That Plaintiffs Did Not Suffer Actual Damages ..................................................................32

    A.    Plaintiffs Borel and Marin's Damages......................................32

    B.    Plaintiff Calderon's Damages ...................................................37

CONCLUSION ....................................................................................................39

CERTIFICATE OF COMPLIANCE.....................................................................40

CERTIFICATE OF FILING AND SERVICE ......................................................41

# <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases:**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) ...............................18

*Alta Wind I Owner Lessor C v. United States*,
    150 Fed. Cl. 152 (Fed. Cl. 2020) .....................................................................32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505 (1986) ......................................................18, 31

*BGT Group, Inc. v. Tradewinds Engine Services, LLC*,
    62 So. 3d 1192 (Fla. 4th DCA 2011).........................................................20, 29

*Burkett v. Morales*,
    128 Ariz. 417, 626 P.2d 147 (App. 1981) .......................................................27

*Edwards v. Vemma Nutrition*,
    2018 WL 637382 (D. Ariz. Jan. 30, 2018) ...............................................20, 29

*Great Western Sugar Co. v. Northern Natural Gas Co.*,
    661 P.2d 684 (Colo. App. 1982).......................................................................26

*Haun v. Don Mealy Imports, Inc.*,
    285 F. Supp. 2d 1297 (M.D. Fla. 2003) ..........................................................37

*Hickson Corp. v. N. Crossarm Co.*,
    357 F.3d 1256 (11th Cir. 2004) .......................................................................18

*Higgs v. Costa Crociere S.P.A. Company*,
    969 F.3d 1295 (11th Cir. 2020) ...........................................................20, 33, 34

*Hirsch v. Jupiter Golf Club LLC*,
    232 F. Supp. 3d 1243 (S.D. Fla. 2017).............................................................26

*Jackson v. BellSouth Telecomms.*,
    372 F.3d 1250 (11th Cir. 2004) .................................................................18, 31

*Janes v. Baptist Hosp. of Miami, Inc*.,
  349 So. 2d 672 (Fla. 3d DCA 1977)........................................................20, 34

*Jones v. TT of Longwood, Inc*.,
  No. 6:06-cv-651, 2007 WL 2298020 (M.D. Fla. Aug. 7, 2007) ..................37

*Lane v. Urgitus*,
  145 P.3d 672 (Colo. 2006) .....................................................................19, 23

*Lazy Dog Ranch v. Telluray Ranch Corp.,*
  965 P.2d 1229 (Colo. 1998) ...................................................................19, 23

*Morrison v. Amway Corp*.,
  323 F.3d 920 (11th Cir. 2003) .....................................................................18

*Old Colony Trust Co. v. City of Omaha*,
  230 U.S. 100, 33 S. Ct. 967, 57 L. Ed. 1410 (1913) ...................................26

*Propeller Monticello v. Mollison*,
  58 U.S. 152 (1854)........................................................................................34

*Reed v. Royal Caribbean Cruises*, Ltd.,
  2021 WL 1348489 (S.D. Fla. March 5, 2021)...............................................36

*Shandong Yongsheng Rubber Co. Ltd*.,
  No. 18-cv-00867-, 2020 WL 1974762 (D. Colo. Apr. 24, 2020) ................34

*Smith v. Owens*,
  848 F.3d 975 (11th Cir. 2017) .....................................................................18

*Sprint Communications Co., L.P. v. APCC Services, Inc*.,
  554 U.S. 269 (2008)......................................................................................32

*State v. Family Bank of Hallandale*,
  623 So.2d 474 (Fla. 1993) .....................................................................19, 22

*Tabler v. Industrial Com'n of Arizona*,
  47 P.3d 1156, 202 Ariz. 518 (Ariz. App. Div. 1, 2002).......................... 26-27

*Taylor v. S. Pac. Transp. Co.*,
  130 Ariz. 516, 637 P.2d 726 (1981) ...................................................... 34-35

*Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*,
  556 F. Supp. 1319 (S.D. Fla. 1983) ................................................................ 26

*U.S. v. American Tobacco Co.*,
  166 U.S. 468 (1897) ........................................................................................ 32

*United Cal. Bank v. Prudential Ins. Co. of Am.*,
  681 P.2d 390, 140 Ariz. 238 (Ariz. App. Div. 1, 1983) .......................... 19, 23

*Vernon v. Qwest Commc'ns Int'l., Inc.*,
  857 F. Supp. 2d 1135 (D. Colo. 2012) ........................................... 20, 29, 30

*Weatherguard Roofing Co. v. D.R. Ward Constr. Co.*,
  152 P.3d 1227 (Ariz. Ct. App. 2007) .................................................... 20, 29

**Statutes:**

28 U.S.C. § 1291 ..................................................................................................... 1

28 U.S.C. § 1332(d) ................................................................................................ 1

28 U.S.C. § 1367 ..................................................................................................... 1

**Other Authorities:**

3 Corbin on Contracts, § 577 ............................................................................... 27

Restatement (Second) of Contracts (1981) § 202(4) ............................................ 26

Restatement (Second) of Torts, § 920A(1), cmt b ............................................... 35

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are at least 100 Class Members in the proposed Class, the combined claims of proposed Class Members exceed $5,000,000, exclusive of interest and costs, and at least one Class Member is a citizen of a state other than Defendant's state of citizenship. The district court also had supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367. This Court has appellate jurisdiction over this appeal under 28 U.S.C. § 1291 as the district court entered final judgment against Appellants and in favor of Appellee. The district court entered Final Judgment on October 3, 2022 (D.E. 234) and Appellants filed a timely Notice of Appeal on October 20, 2022 (D.E. 235).

## <u>STATEMENT OF THE ISSUES</u>

I.    Whether the District Court Erred in Finding that Sixt's Terms and

Conditions Could Not Be Enforced Against Sixt.

II.    Whether the District Court Erred in Finding That Plaintiffs Did Not Suffer

Actual Damages.

## **INTRODUCTION**

Plaintiffs/Appellants Phillipe Calderon, Ancizar Marin, and Kelli Borel Reidmiller each rented a vehicle from Defendant/Appellee Sixt Rent A Car, LLC. Several weeks after returning their vehicles, Sixt sent collection letters and invoices to Plaintiffs seeking payment for damage to the vehicle that allegedly occurred while in their possession.  Contractual responsibility for paying the "cost of repair" is placed upon the customer by Sixt's Terms & Conditions ("T&C").  The T&C also make the customer responsible for other costs incidental to the repair, including "diminished value" and "loss of use."  (D.E. 222-2 at 4).  The T&C also set forth how such costs are to be calculated.

After paying what they believed to be legitimate repair costs, Plaintiffs learned that Sixt was not following its own T&C in the way it imposed repair charges on its customers.  For example, no repairs were ever actually made to Calderon or Borel's rental vehicles. (D.E. 151 at 4, 8-9, 12; Second Amended Complaint). Since there was no actual repair, there is no "cost of repair" as required for customer responsibility under the T&C. (*Id*.) Similarly, diminished value could not be calculated according to the formula set forth in the T&C if repairs were never made. As a result of Sixt's failure to follow its own T&C in charging for repairs, Plaintiffs filed suit for breach of contract and violation of the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA").  Plaintiffs sought a refund of all repair payments collected in violation of Sixt's own T&C.

Sixt filed a motion for summary judgment arguing that it could not be liable for breaching its own T&C because they were not properly incorporated by reference.  Sixt made this argument despite billing Plaintiffs under those same T&C and despite collecting money under those T&C.  (D.E. 206 at 8-9, 11-16; Motion Summary Judgment).  Additionally, Sixt argued that judgment should be entered in its favor because Plaintiffs suffered no damages because their repair invoices were paid by insurance or by other third parties.  (*Id*).

The district court agreed and granted Summary Judgment for Sixt on all claims.  Instead of focusing on Sixt's clear intent to be bound by its own T&C, and despite the fact that Plaintiffs were not contesting incorporation of the T&C, the district court found that because Plaintiffs could not remember receiving a physical copy of the T&C when they picked up the vehicle, the T&C were not incorporated by reference. (D.E. 233 at 5; Summary Judgment Order).  The Court also agreed that Plaintiffs suffered no actual damages because third-parties had paid Sixt for the alleged repairs on their behalf.  (D.E. 233 at 11; Summary Judgment Order).

In the end, Sixt has been allowed to blatantly violate its own T&C and collect and retain money under a contract it now says does not exist.  For the reasons set forth below, the district court's summary judgment must be reversed.

4

## STATEMENT OF CASE AND FACTS

**A.    Introduction of the Class Action Claims**

This case arose from Defendant Sixt's business practice of imposing repair charges upon its rental car customers that violated the terms of its own Rental Agreement, which Sixt unilaterally drafted. Sixt's Rental Agreement consists of two documents, which together constitute the entire agreement: (1) the Face Page Contract and (2) the Terms and Conditions (or "T&C").

In their operative pleading, the Plaintiffs were charged for repairs that were never actually made.  If there was no repair, Plaintiffs argued they could not be responsible for the "cost of repair" as required to trigger responsibility under the T&C. (D.E. 151 at 5, 9-10, 13; SAC). Plaintiffs also asserted that Sixt breached its agreement by calculating "diminished value" as 25% of the estimated repair costs, rather than under the formula Sixt set forth in the T&C.  (D.E. 151 at 9, 13, 23-24).

**B.    Facts Common to All Sixt Customers, including Plaintiffs.**

The "Face Page" part of Sixt's agreement details each customer's day-of,[1] specific rental information, such as the actual vehicle being rented, the daily rate for that vehicle, the number of days for which it is rented as well as any other amounts

---

[1] As discussed more *infra*, each Plaintiffs' rental experience with Sixt began with a website reservation in which Sixt required them to agree that the T&C made available to them online, through a hyperlink or at Sixt's website, would bind the parties and, thus, govern the rental.

5

charged, including optional insurance coverage such as a "Partial Damage Waiver" or Loss Damage Waiver. In its printed form, the Face Page resembles a large grocery store receipt.

All other material terms of Sixt's Rental Agreement with its customers are set forth in its "Terms and Conditions" ("T&C"). Sixt designed its Face Page to incorporate by reference its T&C through the following language:

> . . . By signing below, you agree to the Terms and Conditions printed on the Rental Jacket and to the terms found on this Face Page, which together constitute this Agreement. . .

(D.E. 151-1 at 1-7; Ex. A to SAC).

The T&C printed in the "Rental Jacket" includes eight printed pages, with sixteen sections establishing the vast majority of the material terms of the Rental Agreement. For example, The T&C establish that the customer is "responsible for the cost of repair" if the vehicle is damaged during the rental (D.E. 151-2 at 8; D.E. 222-2 at 4) and for paying "diminished value," which is defined as "the difference between the value of the vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement." (D.E. 151-2 at 7). The "Definitions" section of the T&C defines "Loss Damage Waiver" and "Partial Damage Waiver" both of which relate to Sixt's agreement to "waive your responsibility for the portion of the damage to or loss of the Vehicle that is stated on the Face Page." (D.E. 151-2 at 7-10).

The "Rental Jacket" is a standard form, tri-fold printed pamphlet that Sixt made available at all locations across the United States.   (D.E. 151-2 at 2-12; Ex B to SAC, Compilation of all Plaintiffs' Rental Jackets).  Sixt's typical practice was to make the Rental Jacket available to its customers by, among other ways, placing them in pamphlet holders on the Sixt Kiosk where customers walked up and checked in, having the Sixt employee review the Rental Jacket with the customer before signing the Face Page Contract, and by using the Rental Jacket like an envelope by placing the printed Face Page Contract with the customer's signature into the tri-fold, before both documents were handed over to the customer concurrently.  (D.E. 222-5 at 12-18; Sixt's Resp. to Calderon Request for Admission No. 13).

However, Sixt also made the T&C available through its online booking process and through links provided to its customers in reservation confirmation emails:

> [F]or customers who booked and prepaid for their rentals through Sixt.com during the relevant time period, in order to book their rental, they were required to assent to the Terms and Conditions, which were presented to them and available to them via a hyperlink, by clicking a check box and a button indicating their acknowledgement and acceptance of the Terms and Conditions. Thus, customers who booked and prepaid through the Sixt website were provided access to the Terms and Conditions prior to signing the Face Page of a Rental Agreement. In addition, links to the Terms and Conditions were included in certain rental reservation confirmation emails.

(D.E. 222-5 at 12-18; Sixt Resp. to Calderon Request for Admission No. 13).

Sixt explained in its response to a Request for Admission that customers have

several options for accessing the T&C:

> **[D]enied**. Beginning more than five years prior to the filing of
> this action, customers have had access to the Rental Jacket's terms prior
> to signing the Face Page of the Rental Agreement through multiple
> means.
>
> First, for customers who booked and prepaid for their rentals
> through Sixt.com during the relevant time period, in order to book their
> rental, they were required to assent to the Terms and Conditions, which
> were presented to them and available to them via a hyperlink, by
> clicking a check box and a button indicating their acknowledgement
> and acceptance of the Terms and Conditions. Thus, customers who
> booked and prepaid through the Sixt website were provided access to
> the Terms and Conditions prior to signing the Face Page of a Rental
> Agreement. In addition, links to the Terms and Conditions were
> included in certain rental reservation confirmation emails.
>
> Second, beginning in or about November 2019, when the Sixt
> website was redesigned, all customers booked through the Sixt website
> (whether they prepaid or not) were required to assent to the Terms and
> Conditions, which were presented to them and available to them via a
> hyperlink, by clicking a button indicating their acknowledgement and
> acceptance of the Terms and Conditions. Thus all customers who
> booked through the Sixt website since in or about November 2019 were
> provided access to the Terms and Conditions prior to signing the Face
> Page of a Rental Agreement.
>
> Third, all customers who visited the Sixt website during the
> relevant time period, in connection with booking a rental or otherwise,
> had access to the Terms and Conditions Rental Jacket because there
> was a hyperlink to the "Terms & Conditions" and/or "T & C" at the
> bottom or the side of the website and the Terms and Conditions Rental
> Jacket could be viewed or downloaded from the website. Thus,
> customers who visited the Sixt website were provided access to the
> Terms and Conditions Rental Jacket terms prior to signing the Face
> Page of a Rental Agreement.

Fourth, when Sixt members register for and/or log into the Sixt website, they were presented with a hyperlink to the Terms and Conditions Rental Jacket ("T & C"). Any members who did that were provided access to the Terms and Conditions Rental Jacket prior to signing the Face Page of a Rental Agreement.

Fifth, during the time period relevant to this action, it has been Sixt's practice and procedure to have copies of the Terms and Conditions Rental Jacket available for each customer's review at the rental kiosk and to provide each customer with a copy of the Terms and Conditions Rental Jacket before they leave the rental kiosk. The timing of when the customer physically received the Terms and Conditions Rental Jacket depends on the rental. The customer may have asked the Rental Sales Agent to see a copy of the Terms and Conditions Rental Jacket, copies of the Terms and Conditions Rental Jacket may have been on display or left on the counter of the rental kiosk, the customer may have picked up a copy of the Terms and Conditions Renal Jacket from the counter of the rental kiosk, the customer may have been handed a copy of the Terms and Conditions Rental Jacket before or at the time the customer signed the Face Page of the Rental Agreement, among other possibilities, in which situations the customer received or had access to the Terms and Conditions Rental Jacket at the rental kiosk prior to signing Face Page of the Rental Agreement. In general, during the old checkout process, it was the practice of Sixt agents to place paper copies of the Face Page and a Terms and Conditions Rental Jacket on the counter and review the terms of the rental agreement with the customer before the customer signed the Face Page via an electronic signature pad. Thus, customers were provided access to the Terms and Conditions Rental Jacket at the rental kiosk prior to signing Face Page of the Rental Agreement.

In addition, customers frequently return to the rental kiosk after they have received the Rental Jacket and signed the Face Page of a Rental Agreement to make changes to their rental that result in the generation of an amended Rental Agreement Face Page. For example, the customer may choose to add options, insurance, or products, or choose to change the length of the rental or to change the rental vehicle. Or, a customer may notice pre-existing damage on the rental vehicle, and the Face Page may be revised to note that damage. In such cases, the customers physically receives the Terms and Conditions Rental

9

Jacket before agreeing to and signing the operative Fage Page of their Rental Agreement. The customer may not or may not be required to sign revised Rental Agreement if a toll package is added to the rental after leaving the rental location with the rental vehicle.

Further, in or about August 2019, Sixt began rolling out to its corporate locations an electronic tablet touchscreen that customers use at the rental kiosk to review and sign the Face Page of the Rental Agreement and that includes a hyperlink to the Terms and Conditions Rental Jacket, which the customer may select and use to review the terms before signing the Face Page of the Rental Agreement. A customer cannot complete the checkout process without acknowledging and agreeing to the Face Page and the Terms and Conditions of the Rental Agreement by using their finger to select one or more checkboxes. . . .

Sixth, customers who had a prior rental from Sixt had access to the Terms and Conditions Rental Jacket prior to signing the Face Page of the Rental Agreement through some or all of the foregoing means. At a minimum, customers who had a prior rental from Sixt would have been provided access to the Terms and Conditions Rental Jacket at the rental kiosk during their prior rental, which would have occurred prior to signing the Face Page of the Rental Agreement for the ensuing rental(s)

(D.E. 222-5 at 12-18; Sixt's Resp. to Calderon's Request for Admission No. 13).

Plaintiffs cited Sixt's this discovery admission in their Summary Judgement Statement of Facts, and Sixt reaffirmed the many ways it provided its customers "access to" its T&C: "Reply: Undisputed that the quoted discovery response summarizes various means by which customers generally had "access to" the Terms and Conditions based on Sixt's routine procedures." (D.E. 222 at 2, 4-5 and D.E. 227 at 30; Resp. SUMF and Reply SUMF).

10

**C.      The Plaintiffs' Online Bookings, Rental Car Pick Up, and Damages Paid Pursuant to the Incorporated Terms and Conditions**

**1.      Plaintiff, Philippe Calderon**

On March 23, 2016, Philippe Calderon (with assistance from his daughter), made an online reservation through the www.Sixt.com website for an April 1, 2016, rental at a Miami, Florida location. In its Reply to Plaintiffs' Summary Judgment Statement of Facts, Sixt *admitted* that Calderon was provided access to the T&C:

> Undisputed that Calderon's rental was reserved online on March 23, 2016, that his daughter made the reservation under his name, and that the user had to agree to the version of the Terms and Conditions Rental Jacket that was available on the website at that date as part of the reservation agreement.

(D.E. 207-1 at 21-22; 162, 164; Calderon Depo.).

Sixt's admission also states that "there is no evidence that Calderon ever saw or clicked on the hyperlink[,]" and that:

> Calderon testified that, when he picked up the rental vehicle, he did not receive and was not told how to access the version of the Terms and Conditions Rental Jacket that was in circulation at the time and location of his rental before he electronically signed the Face Page. (D.E.207 at 3; SUMF ¶ 20; D.E. 222 at 2; Resp. SUMF ¶ 20). . . . there is no evidence that Calderon asked to see a copy, picked up a copy, was handed a copy, or otherwise received (or was told how to access) the April 2016 version of the Terms and Conditions before he signed the Face Page. (D.E. 207-1 at 52-54).

However, it is *undisputed* that Calderon also had access to the Rental Jacket when taking possession of the rental car assigned to him:

11

> Calderon "had access to" the March 2016 version of the Terms and Conditions when his daughter made his reservation online in his presence (D.E. 227 at 26-27; Reply SUMF ¶ 86), and that Calderon "had access to" a paper copy of the April 2016 Terms and Conditions when he picked up the rental vehicle in the sense that he could have asked to see a copy of the Terms and Conditions[.]

(D.E. 227 at 28-29; Reply SUMF)

Calderon's Face Page Contract shows that he paid $27 for a "Partial Damage Waiver" (or PDW) fee defined and explained in the T&C. (D.E. 151-1 at 2-7; D.E. 207 at 3-4; D.E. 222 at 2; Face Pages attached to Complaint, Defendants SUMF and Plaintiffs SUMF).

After the rental, Sixt billed Calderon $1,131.65 for repair costs to the rental vehicle and asserted that Calderon was liable for these costs pursuant to his "rental contract" (D.E. 151 at 8-9):

> Plaintiff Calderon received a Collection Letter from Sixt dated January 30, 2017 which was attached to the Invoice stated: "we are asserting out right to claim damage compensation from you as per the rental contract you agreed to."

(D.E. 222-7 at 2).

Ultimately, Sixt applied the $500 Partial Damage Waiver to the portion of the damages for which Sixt personally invoiced Calderon as the responsible party. (D.E. 207 at 5, D.E. 222 at 2).

### 2. Plaintiff, Ancizar Marin

On February 27, 2019, Plaintiff, Ancizar Marin, used the www.oribtz.com website to reserve a Sixt rental car, under his personal name, from a Phoenix, Arizona location for the period of March 5, 2019 through March 8, 2019, culminating with receipt of a confirmation email from Orbitz to Marin's business email address because Marin did not use personal email. (D.E. 207-6 at 13-16; Marin Depo.) Although Marin could not recall whether he clicked the links (D.E. 207-6 at 17), it is undisputed that the Orbitz check out page, on the Orbitz website at the time Marin secured his rental, included the following language and hyperlinks (noted in blue):

By selecting to complete this booking I acknowledge that I have read and accept the Rules & Restrictions, Terms of Use, Privacy Policy and Government Travel Advice.

Reserve Now >

(D.E. 207-6 at 133; Ex. 2 to Marin Depo.).

Marin testified that the rental counter at the Phoenix, Arizona location was like a "normal kiosk, like a bar"; however, he could not recall whether there were any papers on the rental counter. (D.E. 207-6 at 18:20-19:10; Marin Depo.) While Marin did not believe he was handed or shown any papers before signing with a stylus on an electronic, black box (D.E. 207-6 at 20:5-27), he could not recall whether he was handed any papers after signing. (D.E. 207-6 at 21:14-25, 24:3-5). Regardless, it was undisputed in the summary judgment papers (D.E. 227) that:

Plaintiff Marin's Collection Letter from Sixt dated June 5, 2019, which was attached to the Invoice, stated: "In accordance with your rental agreement, we kindly ask you to settle the outstanding amount disclosed in the attached breakdown ..." (D.E. 222-9 at 2).

After the rental, Sixt sent Marin a collection letter seeking payment for repair costs to the vehicle "pursuant to the rental agreement." (D.E. 222-7 at 2). Both Sixt and Marin submitted claims to Marin's personal automobile insurance carrier, AllState, which resulted in AllState submitting two (2) checks to Sixt for a total of $519.00. (D.E. 207-6 at 51:19-59:4, 204-205, 209). Marin paid the remaining $189.62 balance with his business credit card. (D.E. 207-6 at 59:11-60:8).

Sixt never returned the money it obtained from Marin or AllState after filing an insurance claim "pursuant to [Marin's] rental agreement." (D.E. 207-6 at 93:5-7).

### 3.    Plaintiff, Kelli Borel

On May 6, 2019, Plaintiff, Kelli Borel Reidmiller[2], used the www.hotwire.com website to reserve a rental car, under her personal name, from a Denver, Colorado location for the period of June 10, 2019, through June 14, 2019. (D.E. 207-7 at 7:18-20, 8:18-9:2, 9:25-10:1; Borel Depo.) After completing the booking process, Borel received confirmation that her rental car was with Sixt and prepaid for the rental. (D.E. 207-7 at 9:3-18)

---

[2] At the time of the original reservation, Plaintiff Kelli Borel had not yet changed her last name to include the addition of Reidmiller. Throughout this brief, Plaintiff Kelli Borel Reidmiller will be referred to as "Borel."

Because Borel travels often and has rented so many cars over the years, she did not remember all the specifics of this particular rental including whether she was given any paperwork before she signed for the rental; however, she did recall being handed paperwork – including "the jacket" – with the keys, and she recognized her signature on the Face Page Contract shown to her by Sixt at deposition. (D.E. 207-7 at 13:16-16:15, 21:7-23:2, 134-147; Borel Depo. and Ex. 2). Borel waived the insurance Sixt offered and, instead, provided proof of coverage through her personal auto insurance. (D.E. 207-7 at 13:23-14:11, 49:19-22).

Because there was a problem with the initial rental car assigned to Borel, she had to return to the kiosk to obtain keys for a different rental car. (D.E. 207-7 at 17-18). While she did not recall whether she had to sign anything new before receiving the keys to the replacement vehicle, Borel maintained (and produced in discovery during this case, (D.E. 207-7 at 23-24), the actual "rental jacket" handed to her at the Kiosk as well as receipts for the originally rented vehicle and the substituted vehicle, provided to her after having already received the "rental jacket." (D.E. 207-7 at 18:4-6; 19:11-13; 24:17-24; 25:9-26:4, 133-151; Borel Depo. and Exs. 1, 2, 3, and 4). Borel produced a copy of the Rental Jacket during discovery. (*Id*).

It was undisputed in the summary judgment papers (D.E. 227) that:

Plaintiff Borel's Collection Letter from Sixt dated July 3, 2019, which was attached to the Invoice, stated "In accordance with your rental agreement, we kindly ask you to settle the outstanding amount disclosed in the attached breakdown ..." (D.E. 222-10 at 2).

15

After the rental vehicle was returned, Sixt sent Borel a collection letter asserting that she personally owed money for repair costs to the vehicle (D.E. 207-7 at 56:9-58:25, 163-176; Borel Depo. and Ex. 9) "pursuant to the rental agreement." (D.E. 222-10 at 2)  Borel facilitated payment to Sixt of $523.75 to satisfy the damage claim against her, which payment was submitted by Borel's employer. (D.E. 207-7 at 77:25-78:9; 89:25-90:6).  Sixt accepted the payment and closed the damages file associated to Borel. (D.E. 207-7 at 89:25-90:6).  Sixt did not return the payment made on Borel's behalf after it asserted that the T&C were not incorporated by reference.

## D.    The Trial Court's Order

Despite the fact that Sixt uses its T&C to contract with thousands of consumers every day, Sixt filed a motion for summary judgment arguing that its own T&C were not incorporated by reference.  In support of this position, Sixt cited to deposition testimony from the Plaintiffs stating that they did not recall receiving a paper copy of the T&C before signing the Face Page.  (D.E. 206 at 13-16).  Because the T&C were not incorporated, Sixt argued that it could not be held liable for breaching those terms when it billed Plaintiffs for repair costs.  (D.E. 206 at 17; MSJ).

Despite the fact that Plaintiffs were not contesting the incorporation of Sixt's T&C, the district court agreed with Sixt and found that "it is ***mostly*** undisputed that Plaintiffs were not shown or told how to access the Terms and Conditions before they signed the signature pad, and that the only disputed points concern testimony

where Plaintiffs could not recall whether they were shown the Terms and Conditions prior to signing." (D.E. 233 at 4-5; Order) (emphasis added). Regardless of evidence that the T&C were available at the rental counter, the district court determined that "Plaintiffs cite no record evidence that could support the inference that Plaintiffs were shown the Terms and Conditions before signing. Therefore, it is undisputed that Defendant Sixt departed from its routine procedure with regard to Plaintiffs' rental because it failed to show Plaintiffs the Terms and Conditions or tell Plaintiffs how to access them before signing" (*Id*. at 5). As a result, the Court granted judgment for Sixt on Plaintiffs' breach of contract claim for imposing repair costs in violation of its own T&C. (*Id.* at 15).

Additionally, Sixt argued that judgment should be granted in its favor on Plaintiff's FDUTPA claim because Calderon made no payment other than through the Partial Damage Waiver and because the repair cost payment for Marin and Borel were paid by insurance or their employers. (D.E. 206 at 19-22; MSJ). The district court again agreed and found that payments by these collateral sources were insufficient to constitute actual damages as required. (D.E. at 233 at 14-15; Order). Summary judgment was granted in favor of Sixt on Plaintiffs FDUTPA claim as well. (*Id*).

17

After final judgment was entered, Plaintiffs filed this timely appeal challenging the district court's findings on incorporation by reference of the T&C and on damages paid by collateral sources.

## STANDARD OF REVIEW

A district court's decision on summary judgment is reviewed de novo and this Court applies the same legal standard used by the district court, drawing all inferences in the light most favorable to the non-moving party and recognizing that summary judgment is appropriate only where there are no genuine issues of material fact. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017).

"An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id*. at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Jackson v. BellSouth Telecomms*., 372 F.3d 1250, 1280 (11th Cir. 2004). The Court should not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505; *Morrison v. Amway Corp*., 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id*.

## SUMMARY OF THE ARGUMENT

The district court committed reversible error in determining that Sixt's T&C were not incorporated by reference for three reasons.  First, a paper copy of the T&C was provided to Plaintiff Borel contrary to the conclusion reached by the district court.  (D.E. 207-7 at 24:2-24; Borel Depo.).

Second, the district court failed to properly evaluate the intent of the parties to be bound by the T&C as expressed though contractual language and conduct of the parties. "In order to form a binding contract there must be a common or mutual intention of the parties to be bound." *State v. Family Bank of Hallandale*, 623 So.2d 474, 479–80 (Fla. 1993).  In contractual settings, Colorado courts "can look to the circumstances surrounding the contract's formation in construing the contract, in order to carry out the intent of the contracting parties." *Lane v. Urgitus*, 145 P.3d 672, 679 (Colo. 2006) (citing *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1235 (Colo. 1998). "In ascertaining the parties' intent [to incorporate a document by reference], the court will look to the plain meaning of the words as viewed in the context of the contract as a whole." *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 411, 140 Ariz. 238, 259 (Ariz. App. Div. 1, 1983).

Third, as long as access to the document to be incorporated was readily available, a physical copy need not be provided for a valid incorporation by reference to occur under the law of the three states at issue.  Under Florida law, the collateral

document to be incorporated need only be "sufficiently described or referred to in the incorporating agreement, so that the intent of the parties may be ascertained." *BGT Group, Inc. v. Tradewinds Engine Services, LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011)(internal citations omitted).  Arizona law does not require that a contracting party "see the incorporated document if the document is easily available." *Edwards v. Vemma Nutrition*, 2018 WL 637382, at *3 (D. Ariz. Jan. 30, 2018) (citing *Weatherguard Roofing Co. v. D.R. Ward Constr. Co.*, 152 P.3d 1227, 1230 (Ariz. Ct. App. 2007))*.  See also*, *Vernon v. Qwest Commc'ns Int'l., Inc.*, 857 F. Supp. 2d 1135, 1150 (D. Colo. 2012)(holding customers to a "Subscriber agreement" only available on defendant's website).  Accordingly, it was error for the district court to find that the T&C were not incorporated by reference because a physical copy was not provided, when the evidence showed that they were available in each Sixt rental location.

The district court also committed reversible error in determining that Plaintiffs suffered no damages because the payments to Sixt were made by third-parties.  The district court's finding was contrary to the well-established principle that money paid by a collateral source does not preclude a finding of damages or diminish the liability of a tortfeasor. *See Higgs v. Costa Crociere S.P.A. Company*, 969 F.3d 1295, 1310 (11th Cir. 2020); *see also Janes v. Baptist Hosp. of Miami, Inc*., 349 So. 2d 672, 673 (Fla. 3d DCA 1977).

## ARGUMENT

**I.    Whether the District Court Erred in Finding that Sixt's Terms and Conditions Could Not Be Enforced Against Sixt**

Sixt billed Calderon, Marin, and Borel for the cost of alleged repairs to their rental vehicles under Section 5 of the T&C, and accepted payments for those repairs. (D.E. 207-6 at 204-206; Marin Depo. Ex. 15, 16, 18).  Plaintiffs sued Sixt for breach of contract because Sixt's repair charges were not imposed in accordance with its own T&C.  (D.E. 151 at 22-24; SAC).  Sixt sought summary judgment arguing that its T&C were not incorporated by reference. Sixt relied upon evidence that Plaintiffs did not recall receiving a copy of the T&C which precluded incorporation.

The trial court agreed and found that the T&C were not incorporated by reference because the Plaintiffs did not recall receiving a copy when they picked up the vehicle.  Therefore, the court found that Sixt did not breach its contract.  (D.E. 233 at 4; Summary Judgment Order).  In reaching this conclusion, the district court focused almost exclusively on whether each Plaintiff recalled receiving a physical copy of the T&C when they picked up the vehicle.  "Calderon testified he did not recall being shown or given "any paperwork" before he signed the rental contract." (D.E. 233 at 6); "Marin further testified he was no shown or handed any papers before signing." (D.E. 233 at 7); and Borel – "Plaintiffs cannot prove Borel had knowledge of, let alone assented to, the Terms and Conditions because there is simply no record evidence that could support an inference that she received or had

21

access to the Terms and Conditions before signing." (D.E. 233 at 7). There are several reasons why the district court erred in reaching this conclusion.

### A.    Borel Received a Copy of the Rental Jacket

First, the district court's determination that there is "no record evidence" that Borel "received or had access to" the T&C is simply incorrect. While Borel indeed testified at deposition that she did not specifically recall being shown the terms of the Rental Jacket, as reference by the district court (D.E. 233 at 7; Summary Judgment Order), she later testified that she produced a paper copy of the rental jacket in discovery and that the document must have been provided to her "at the rental counter." (D.E. 207-7 at 24:2-24). This alone is reason enough to reverse the district court's order regarding the T&C not being incorporated by reference in Borel's transaction with Sixt because it clearly contradicts the Court's determination that she did not receive a copy of the T&C.

### B.    The District Court Failed to Consider the Intent of the Parties

The district court misapplied the law of the states where the transactions occurred, Florida, Arizona and Colorado. (D.E. 233 at 5-8; Summary Judgment Order). Each of these states require a court to examine the intent of the parties when determining incorporation by reference. "In order to form a binding contract there must be a common or mutual intention of the parties to be bound." *State v. Family Bank of Hallandale*, 623 So.2d 474, 479–80 (Fla. 1993). In contractual settings,

Colorado courts "can look to the circumstances surrounding the contract's formation in construing the contract, in order to carry out the intent of the contracting parties." *Lane v. Urgitus*, 145 P.3d 672, 679 (Colo. 2006) (citing *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1235 (Colo. 1998). "In ascertaining the parties' intent [to incorporate a document by reference], the court will look to the plain meaning of the words as viewed in the context of the contract as a whole." *United California Bank v. Prudential Ins. Co. of America*, 681 P.2d 390, 411, 140 Ariz. 238, 259 (Ariz. App. Div. 1 1983).

The intention of Sixt should have been determined by the drafting of its contract and its standard course of dealing. Sixt designed its Rental Agreement to contain two parts.  The "Face Page" which includes the details of each renter's specific contract, including the specific vehicle being rented (e.g., black 2022 Mercedes C Class), the daily rental rate for that vehicle, the number of days rented, the payment method, and prior damage to that rental vehicle. (D.E. 207-7 147-151, D.E. 222-1 at 4-7; Borel Face Page).  Sixt chose to include all other terms of its contract in its T&C.  (D.E. 207-7 at 134-146; Borel Depo. Ex. 2 and D.E. 222-2 at 1-8; Ex. B Opp. to MSJ).  This way, the combined agreement contains both the specific rental terms pertaining to specific individuals (Face Page) with the common and uniform material terms that apply to all Sixt customers (T&C).

The T&C is several pages long and defines the "Agreement" between the parties as "the terms and conditions on this page and the provisions found on the Face Page." (D.E. 207-7 at 141, D.E. 222 at 3). The T&C also contains the majority of the material terms of the agreement between Sixt and its customers including: liability for damage, indemnification of Sixt, repossession of the rental vehicle, specific legal disclosures required by the state where the vehicle is obtained, conditions on how the vehicle is to be returned to Sixt, who is responsible for damage or loss, optional equipment, the terms of Sixt's "loss damage waiver", lost keys, roadside assistance, that the renter is responsible for insuring the vehicle, terms of breach, how the contract can be modified, jurisdiction, and child safety seats. (D.E. 222 at 2-8; T&C).

To express the intent of the parties to be bound by the T&C, the Face Page states:

> By signing below, you agree to the Terms and Conditions printed on the rental jacket and to the terms found on this Face Page, which together constitute this Agreement. You acknowledge that you have been given an opportunity to read this Agreement before being asked to sign it, and that all information you have provide is true and correct.

(D.E. 207-7 at 151, D.E. 222-1 at 7).

Not only does Sixt incorporate by reference the T&C into its Face Page, it also incorporates by reference the Face Page into its T&C:

24

> "Agreement" means the terms and conditions in these Terms and Conditions and the provisions found on the Face Page.

(D.E. 222-1 at 3; T&C No. 1).

Sixt's T&C were also available on its website, Sixt.com for those customers, like Calderon, who made a reservation via Sixt.com. (D.E. 222-5 at 13-19). And, Sixt explained in its Request for Admission response, that customers using third-party reservation websites such as "Expedia, Orbitz Hotwire and others," were required to assent to the same "Terms and Conditions" (D.E. 222-5 at 13-19). Sixt also stated that its normal business practice was to have paper copies of its T&C available at each Sixt location:

> [D]uring the time period relevant to this action, it has been Sixt's practice and procedure to have copies of the Terms and Conditions Rental Jacket available for each customer's review at the rental kiosk and to provide each customer with a copy of the Terms and Conditions Rental Jacket before they leave the rental kiosk.

(D.E. 222-5 at 14-15).

Thus, the language used in the Face Page and the T&C themselves, its publication of the T&C on its website, and the provision of paper copies at each location clearly shows that Sixt intended to be bound, and it intended for its customers to be bound, by the T&C. The district court failed to address why the language above used by Sixt was unclear. After all, only Sixt challenged the enforceability of the T&C. None of the Plaintiffs challenged the incorporation of the T&C.

25

Furthermore, the district court failed to properly analyze the conduct of the parties after the rental vehicles were returned as additional evidence of a mutual intent to be bound by the T&C. That is the law of all states at issue. "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, 33 S. Ct. 967, 57 L. Ed. 1410 (1913). "[A] Court may review the original contracting parties' post-contract course of performance of the agreement to interpret their intent." *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252 (S.D. Fla. 2017)(citing *Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1336 (S.D. Fla. 1983)(citing Restatement (Second) of Contracts (1981) § 202(4), which provides "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"). "The long history of the parties' conduct under the contracts is relevant, and the court properly considered it." *Great Western Sugar Co. v. Northern Natural Gas Co.*, 661 P.2d 684, 691 (Colo. App. 1982). In determining the parties' intent to contract, the Court "may consider surrounding circumstances and the conduct of the parties." *Tabler v.*

*Industrial Com'n of Arizona*, 47 P.3d 1156, 1159–60, 202 Ariz. 518, 521–22 (Ariz. App. Div. 1, 2002)(citing *Burkett v. Morales*, 128 Ariz. 417, 418, 626 P.2d 147, 148 (App. 1981) (citing 3 Corbin on Contracts, § 577)).

Here, the conduct of both Sixt and Plaintiffs after the rental was complete shows a unanimous intent to be bound. Initially, Sixt offered, and Calderon purchased a "Partial Damage Waiver" which is shown on Calderon's Face Page at a price of $29.97. (D.E. 207-4 at 156:2-14; Calderon Depo.).  The Partial Damage Waiver is defined in the T&C and is designed to cover a portion of the customer's liability should the rental vehicle be damaged.  (D.E. 222-5 at 4-6; T&C No. 6).  The fact that Calderon purchased this product is evidence that he believed that he was personally liable for damage to the rental vehicle while in his possession.  The fact that Sixt accepted payment from Calderon for Partial Damage Waiver shows that Sixt also believed that the T&C applied to its contract with Calderon.  Without the T&C, Calderon had no risk to insure against, and the Partial Damage Waiver was worthless.

The district court also ignored Sixt's collection letters to Plaintiffs seeking payment pursuant to the "rental agreement" for repairing alleged damage to rental vehicles.  (D.E. 222-8 at 2-3, D.E. 222-9 at 2, D.E. 222-10 at 2; letters sent to Plaintiffs).  Because the *only* contract that includes a provision making the customer liable for damage to the rental vehicle is the T&C, these letters are evidence that Sixt

27

intended the T&C to be binding on both it and all three Plaintiffs. (D.E. 222-2 at 4; T&C No. 5).

The district court also ignored the evidence of damage payments made and accepted by the parties. Sixt accepted payments for alleged repairs on the Borel and Marin vehicles. (D.E. 207-6 at 55:2-60:8; D.E. 207-7 at 89:13-90:17). Specifically, Sixt accepted Marin's partial payment from his personal insurance company, AllState, before dunning him for the remainder. (D.E. 207-6 at 204-211, Marin Depo. Ex. 15-19). Sixt likewise accepted payment for the alleged damage to Borel's rental vehicle. (D.E. 207-7 at 89:13-90:17; Borel Depo.). The payment of these amounts by Marin and Borel shows that they believed they were bound by the T&C. Acceptance of these payments by Sixt shows that it believed it was bound by the T&C.

Finally, even after filing its motion for summary judgment, Sixt continues to retain all payments made by Plaintiffs, or made on Plaintiff's behalf, despite allegedly having no contractual right to such payments. This conduct also shows Sixt's intent to be bound by the T&C.

Thus, there was substantial evidence presented to the district court that Sixt and all three Plaintiffs intended to be bound, and believed they were bound, by the Sixt T&C. Instead of viewing this evidence in the light most favorable to Plaintiffs, the district court ignored all evidence of the parties' intent, focusing instead on

whether each Plaintiff recalled receiving a paper copy. This was clear error because genuine issues of material fact existed on whether Sixt was bound by its own T&C.

### C.    Access to the Incorporated Document Is All that Is Required

In addition, the district court improperly determined that a physical copy must have been provided to each Plaintiffs for the document to be incorporated. (D.E. 233 at 5). Simply put, a physical copy is not required if the incorporated document is reasonably identified and accessible. This is the law in each of the states at issue.

Under Florida law, the collateral document to be incorporated only must be "sufficiently described or referred to in the incorporating agreement, so that the intent of the parties may be ascertained." *BGT Group, Inc. v. Tradewinds Engine Services, LLC*, 62 So.3d 1192, 1194 (Fla. 4th DCA 2011)(internal citations omitted). Likewise, Arizona law does not require that a contracting party "see the incorporated document if the document is easily available." *Edwards v. Vemma Nutrition*, 2018 WL 637382, at *3 (D. Ariz. Jan. 30, 2018) (citing *Weatherguard Roofing Co. v. D.R. Ward Constr. Co.*, 152 P.3d 1227, 1230 (Ariz. Ct. App. 2007)).

Although Borel did receive a paper copy of her Rental Jacket (D.E. 207-7 at 24:2-25:1; Borel Depo.), one was not required in Colorado. Colorado law holds that "where a party seeks to enforce terms or conditions incorporated by reference in a contract, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Vernon v. Qwest Commc's Int'l., Inc.*, 857 F.

29

Supp. 2d 1135, 1150 (D. Colo. 2012)(holding customers to a "Subscriber agreement" only available on defendant's website). "Evidence of assent may be gleaned from the totality of the circumstances", rather than proof of a physical copy. *Id.*[3]

Here, Sixt's interrogatory responses created an undisputed fact that Sixt customers had several ways to *access* its T&C. (D.E. 222-6 at 117-125). Most important to this appeal is the undisputed fact that all customers had access to a paper copy of the T&C when they picked up the vehicle:

> [D]uring the time period relevant to this action, it has been Sixt's practice and procedure to have copies of the Terms and Conditions Rental Jacket available for each customer's review at the rental kiosk and to provide each customer with a copy of the Terms and Conditions Rental Jacket before they leave the rental kiosk.

(D.E. 222-6 at 19).

Once the Face Page identified the T&C by name and explained that those terms were "printed on the rental jacket," the incorporated document was called to the attention of the Sixt customers. Thereafter, having copies of the T&C Rental Jacket readily available at the Sixt pick-up location is all that is legally required for the T&C to be incorporated by reference under Florida, Arizona or Colorado law.

---

[3] Because Borel proved that she actually did receive a physical copy of the Sixt Rental Jacket, she need not prove more. (D.E. 207-7 at 24:17-24; 25:9-26:4; Borel Depo.).

The fact that Plaintiffs do not remember actually receiving a paper copy does not mean, as a matter of law, that they did not have access to the document.

Sixt does business with thousands of customers each day and has a normal course of dealing and expects all of its customers to be bound by the T&C. Yet it seeks to avoid the T&C when sued for breaching those same contract terms. The district court should not have "weigh[ed] the evidence or ma[de] findings of fact" in this regard. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2505. Instead of viewing this contradictory evidence in the light most favorable to Plaintiffs, the district court viewed it in the light most favorable to Sixt by finding that the plaintiffs' lack of memory made it "undisputed that Defendant Sixt departed from its routine procedure with regard to Plaintiffs' rentals…" (D.E. 233 at 5; Summary Judgment Order). A lack of memory does not create an undisputed fact. One may not recall what they ate for dinner on a Tuesday night six months prior, but that does not create an undisputed fact that one did not eat dinner that night. By holding that Plaintiffs' lack of memory trumps Sixt's routine practices as a matter of law, the district court failed to weigh the evidence in the light "most favorable to the non-moving party" as it was required to do. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Accordingly, the district court's determination that the Sixt T&C were not incorporated by reference should be reversed as contrary to the legal precedent cited herein and due to the intent of the parties as shown by the evidence presented.

## II. Whether the District Court Erred in Finding That Plaintiffs Did Not Suffer Actual Damages

### A. Plaintiffs Borel and Marin's Damages

Sixt admits that it accepted payment for both Marin and Borel's individual invoices but argues that each suffered no actual damages because the payments were made by third parties on their behalf. (D.E. 206 at 21-22; Motion for Summary Judgment). Thus, it argued that Plaintiffs' breach of contract and FDUTPA claims failed as a matter of law.

In response, Plaintiffs argued that it is legally irrelevant whether the invoices were paid by Borel's employer or Marin's insurance company because Plaintiffs were individually obligated under the terms of the agreements with Sixt – not the third party payor. *See., e.g., U.S. v. American Tobacco Co*., 166 U.S. 468, 477-78 (1897) (permitting an indemnified plaintiff to bring suit even if proceeds of the litigation are passed to its insurer because the "the cause of action rests on the rights of the [insured party]" and if barred from bringing suit, defendant "would be in the position of one who retained money to which it had no equitable right."); *Alta Wind I Owner Lessor C v. United States*, 150 Fed. Cl. 152, 168 (Fed. Cl. 2020) (finding that plaintiff's prior agreement with a third party as to payment did not preclude plaintiff 'ability to bring suit ); *Sprint Communications Co., L.P. v. APCC Services, Inc*., 554 U.S. 269, 286 (2008).

However, the district court disagreed and held that Marin and Borel did not sustain any actual damages because payments were made by third parties. (D.E. 233 at 10-12; Order).  The district court's finding is erroneous and contrary to long standing precedent that allows a plaintiff to recover damages even when their obligation was paid by an insurance company or other third party on plaintiff's behalf.

Here, the district court's order rewards the tortfeasor and is contrary to the longstanding law on damages as explained by this Court in *Higgs v. Costa Crociere S.P.A. Company:*

> In its substantive role, the collateral source rule provides that a plaintiff is entitled to recover the <u>full value of the damages caused by a tortfeasor</u>, without offset for any amounts received in compensation for the injury from a third party (like an insurance company or a family member)…

> But the law conceptualizes the collateral source payment as necessarily a windfall -- after all, <u>a party other than the victim</u> or the alleged tortfeasor <u>has voluntarily chosen to bear the costs of the victim's injury</u> -- <u>that is better awarded to the plaintiff than the tortfeasor</u>.  Moreover, this rule is understood to avoid discouraging plaintiffs from prudently paying for insurance by limiting their recoveries, and it deters negligence by punishing tortfeasors for the full amount of their wrongdoing. *Id.*

969 F.3d 1295, 1310 (11th Cir. 2020)(emphasis added).  The *Higgs* decision goes on to explain that "the rule allows a plaintiff to recover damages for a harm for which she has already been compensated." *Id*. at 1310.  In practice, the collateral source rule is "both a substantive principle of damages and an evidentiary rule." *Id.*

33

Florida law has also adopted the collateral source rule and held that:

> the proposition that total or partial compensation received by the injured party from a collateral source wholly independent of the wrongdoer <u>will not operate to lessen the damages recoverable from the person causing the injury</u>. . .

> it is well settled that recovery of damages from a tort feasor may not be reduced by the amount of insurance proceeds received by the injured party from his insurance company; <u>a wrongdoer should not be permitted to benefit from a policy of insurance where there is no privity between him and the plaintiff's insurer</u>, and the policy was written for the benefit of the insured and not the wrongdoer; if there must be a windfall, it is more just that the injured party profit, rather than the wrongdoer be relieved of full responsibility for his wrongdoing. <u>The value of services rendered the injured party are a proper element of damages even though they were paid for by a collateral source</u>.

*Janes v. Baptist Hosp. of Miami, Inc*., 349 So. 2d 672, 673 (Fla. 3d DCA 1977) (citations omitted) (emphasis added).

This doctrine was first enunciated long ago by the Supreme Court in *Propeller Monticello v. Mollison*, 58 U.S. 152 (1854), where it explained that a defendant "cannot avail" himself of the benefit of the plaintiff's insurance "wager." *Id*. at 155. The rule's vitality continued in the United States and has been established in almost every state, including, Florida, Colorado, and Arizona. *See Higgs*, 969 F.3d at 1310 (Florida law); *Shandong Yongsheng Rubber Co. Ltd*., No. 18-cv-00867-, 2020 WL 1974762, at *1-2 (D. Colo. Apr. 24, 2020) (Colorado law, the collateral source rule bars evidence at trial of payments made by an independent entity or person that compensates plaintiff for his/her injuries); *Taylor v. S. Pac. Transp. Co.*, 130 Ariz.

34

516, 519-520, 637 P.2d 726, 729-730 (1981) (The "collateral source rule is that a tortfeasor should not be permitted a windfall simply because the plaintiff might have contracted for reimbursement through a third party, such as insurance."). The same long-standing principle is also explained in the Restatement (Second) of Torts, § 920A(1), cmt b:"[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers."

As to Marin, a Sixt collection letter was sent to him individually in connection with his personal rental from Sixt. (D.E. 222-9 at 2; Marin Letter). Due to Sixt's efforts to collect, Marin and Sixt both submitted claims to Marin's insurance provider Allstate, which resulted in a payment to Sixt for Marin's invoice in the amount of $519.00. (D.E. 207-6 at 51:19-59:4, 204-205, 209). The important fact that Marin's claim was also paid by his insurance is ignored by the district court. Not only did Marin's insurance pay Sixt, but Marin's business paid the $189.62 balance owed on his business credit card. (D.E. 207-6 at 59:11-60:8). Sixt retained

the amount of money paid in connection with Marin's invoice despite its assertion that there is not contract. (D.E. 207-6 at 93:5-7).

Similarly, Borel received a collection letter from Sixt in her individual capacity for money she owed as a result of the vehicle she personally rented. (D.E. 207-7 at 56:9-58:25, 163-176; Borel Depo. and Ex. 9). The invoiced amount of $523.75 was paid by her employer and accepted by Sixt. (D.E. 207-7 at 77:25-78:9; 89:25-90:6). Sixt accepted the payment and closed her damages file.  (D.E. 207-7 at 89:25-90:6).

Plaintiffs' payment arrangements with these third-party payors fall squarely within the collateral source doctrine which prevents the tortfeasor (Sixt) from retaining the payments made on Borel and Marin's invoices. It is simply irrelevant for purposes of establishing damages that a third party payor ultimately paid for charges pursuant to a contract between Sixt and Plaintiffs and that Plaintiffs had their own arrangement for payment by another third party. This does not resolve or reduce Sixt's liability. *See Reed v. Royal Caribbean Cruises*, *Ltd.*, 2021 WL 1348489, at *8 (S.D. Fla. March 5, 2021) (grating plaintiff's motion for summary judgment in connection with defendant's attempt to offset, reduce or negate the amounts paid by a collateral source)

In its order, the district court cites two decisions to support its determination that Plaintiffs did not sustain actual damages because out of pocket losses as required. However, each of these opinions are distinguishable for one important

reason – no money was retained by the defendant in either case. *See Jones v. TT of Longwood, Inc.*, No. 6:06-cv-651, 2007 WL 2298020, at *7 (M.D. Fla. Aug. 7, 2007) (no damages because down payment for car was refunded to plaintiff and no additional fees were charged by defendant or insurer); *Haun v. Don Mealy Imports, Inc.*, 285 F. Supp. 2d 1297, 1307 (M.D. Fla. 2003) (plaintiff's claim for damages are merely "feelings of disappointment" because plaintiff never paid for the vehicle and his deposit was refunded.).  Contrary to those facts, money was paid and retained by Sixt from Marin and Borel.  If their claims are dismissed, Sixt will reap a windfall simply because the Plaintiffs were smart enough to make arrangements for others to pay the costs.  This goes directly to the underlying purpose of the collateral source rule.

Accordingly, the district court erred in finding that Plaintiffs failed to establish they incurred actual damages as a result of payments made by collateral sources. The district court's order grating summary judgment should be reversed in this regard.

### B.    Plaintiff Calderon's Damages

Sixt argued that its own T&C were not incorporated by reference into Calderon's Face Page Contract and the district court agreed.  (D.E. 233 at 5-6; Summary Judgment Order).  The court further found that Calderon did not suffer any actual damages as a result of his $27 payment to Sixt for a product defined as

"Partial Damage Waiver" because he received the benefit of the bargain when Sixt applied the $500 worth of "waiver" towards the damage to his rental vehicle. (D.E. 233 at 12; Summary Judgment Order).  But, these findings are inconsistent.

It is undisputed that Calderon's responsibility for damage to the vehicle arises solely out of Sixt's T&C.  (D.E. 151-1 at 2-7; D.E. 207 at 3-4; D.E. 222 at 2). If the T&C do not apply to Calderon, then he is not contractually liable for damage to the vehicle.  If he is not liable for damage to the vehicle, then there is no reason for him to purchase the Partial Damage Waiver, which is only purchased to cover such liability.  In other words, if Sixt's T&C were not incorporated by reference, then Calderon's $27 payment for a product that he could never use constitutes actual damages.   Calderon's $27 payment to Sixt also constitutes actual damages for FDUTPA if the district's court order on incorporation as reference is affirmed.

In the alternative, if the district court's order is reversed and the T&C are binding on Calderon and the other Plaintiffs, Calderon recognize that this damage theory does not apply.

## <u>CONCLUSION</u>

Every day, Sixt contracts with customers using its T&C as set forth in its Rental Jacket.  Every day it bills insurance companies and imposes for charges for damage caused by rental customers under those same T&C.  It does so without ever asking whether they were shown a copy of the document.  It should not be able to avoid its own contract terms when challenged by arguing that its own procedures allow it to avoid liability.  This is especially true where payment has already been made.  The district court's summary judgment order must be reversed to avoid an injustice to Plaintiffs and the thousands of other Sixt customers who have been unlawfully billed in violation of the Sixt Terms & Conditions.

Dated: January 30, 2023

**VARNELL & WARWICK, P.A.**

/s/ Brian W. Warwick
Brian W. Warwick; FBN:  0605573
Janet R. Varnell; FBN:  0071072
Matthew T. Peterson, FBN: 1020720
Erika R. Willis, FBN: 100021
1101 E. Cumberland Ave., Ste. 201H, #105
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
mpeterson@vandwlaw.com
ewillis@vandwlaw.com
ckoerner@vandwlaw.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P.

   32(a)(7)(B)(i) because:

   > this brief contains <u>9,727</u> words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   > this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Office Word</u> in <u>Times New Roman</u>, <u>14-point</u>.

Dated: January 30, 2023                **VARNELL & WARWICK, P.A.**

/s/ Brian W. Warwick
Brian W. Warwick; FBN:  0605573
Janet R. Varnell; FBN:  0071072
Matthew T. Peterson, FBN: 1020720
Erika R. Willis, FBN: 100021
1101 E. Cumberland Ave., Ste. 201H, #105
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
mpeterson@vandwlaw.com
ewillis@vandwlaw.com
ckoerner@vandwlaw.com

*Counsel for Appellants*

40

<u>**CERTIFICATE OF FILING AND SERVICE**</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on January 30, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.

Dated: January 30, 2023                    **VARNELL & WARWICK, P.A.**

/s/ Brian W. Warwick
Brian W. Warwick; FBN:  0605573
Janet R. Varnell; FBN:  0071072
Matthew T. Peterson, FBN: 1020720
Erika R. Willis, FBN: 100021
1101 E. Cumberland Ave., Ste. 201H, #105
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
mpeterson@vandwlaw.com
ewillis@vandwlaw.com
ckoerner@vandwlaw.com

*Counsel for Appellants*

41